Thank you, Your Honor. I'm Jim Tree. I represent Julia Burrow in this case. Before the court is our motion on appeal for Julia Morrow's social security disability case and also as a separate motion to strike two pages of evidence. Just assume that it's in there for now. All right. I'd like to first address my remarks without referring to these two pages so that if they're stricken. I think they're not essential to our case in this matter, but they do give some perspective, long-term outlook on it. And so I'd like to discuss it first without reference to those two pages. But, Your Honor, the history of Julia Burrow is that when she was just three years old, her parents separated. She only saw her biological father three or four times. The record states that her mother remarried. She had a very strict mother that severely spanked her as a child growing up. Her mother and father and stepfather all died. She married three times, a very short first marriage, short second marriage, where her husband was abusive to her. And then, thirdly, she's been married now for over 30 years to this husband. She went to work at Safeway as a grocery clerk and worked for over 30 years. She received many awards while she was working for Safeway, and the records from all the psychologists said she was very cooperative and candid with them and that they saw that her identity of a person, her worth, was greatly enlarged with her being a Safeway employee. She was very much a team player, and unfortunately she had several significant injuries during her life beginning in 1970. She had a cervical fusion. She had a lumbar fusion. The administrative law judge said that currently, when he saw her, that she had failed back syndrome from her lumbar spine post fusion from a cervical. Mr. Treat, we're pretty familiar with your briefing and with the record. If you could address for me the error that you perceive in the ALJ's failure to consider the mental and the physical in combination, that would help me evaluate the case. Thank you, Your Honor. The administrative law judge said that he was denying her mental claim at Step 2, Step 2, of course, being to get rid of frivolous claims, a de minimis screening device. And so our position is if we can show that her mental impairments lasted 12 months and were more than at least mildly affect her work activities, then the ALJ's decision contains legal error and should be at least remanded. In this particular case, the reasons that we feel that the judge committed legal error in his analysis at Step 2 of the mental impairment, he said that he gave weight to Dr. Vanderbilt, a one-time LNI examiner that examined her for psychological over her treating psychiatrist, Dr. Harrison, that saw her on a regular basis on many occasions. An interesting note is that Dr. Vanderbilt, in functioning, gave her a more severe functioning rating than the treating doctor did. Dr. Harrison had given her a global assessment functioning after she was released from her inpatient hospitalization state in 1998 of a GAF of 60. One of the errors that ALJ Dethloff made was in his decision, he said a GAF score equals mild impairments. According to the DSM-IV, a GAF score of 60 is moderate impairments, not mild. So that was an error that he made in his findings that led him to say that she only had mild impairments. Dr. Vanderbilt, whose report he did rely on, gave a GAF score of 55 to 60, lower than Dr. Harrison's, in fact, rather than higher. He said not only was that the current GAF score late in 1998, but also that was the highest in the 12 months preceding that, 55 to 60. The difference between Dr. Vanderbilt and Dr. Harrison was basically their conclusions. Dr. Vanderbilt stated that he felt she could return to work with certain restrictions. Dr. Harrison felt like she couldn't return to work. But there's no doubt that there was functional limitations and more than mild restrictions on work-like activities from her mental impairments. Dr. Vanderbilt says the record is very well developed that she has a true bipolar II disorder. So he concurred with the treating doctor, Dr. Harrison, who had found a bipolar II disorder. He said that he did this based upon a look at a Beck Inventory depression scale, which was positive for clinical depression, on an MMPI, which was positive for mood disorder, and that he felt it was well documented in the records and on his clinical interview that this lady had a bipolar II disorder. Bipolar II is what degree? I mean, what does the II signify? Well, Your Honor, I believe that what they explained in this case was that she has major depressive episodes, and that's her predominant problem is major depressive episodes. Those are broken sometimes with hypomania, not a full-blown mania, but a hypomania, which she had on several occasions. And she was having one in 1998 when she stepped in front of a car and tried to commit suicide. She wasn't hit by the car, but she was taken to the hospital, and she was hospitalized for a week at the psychiatric hospital in Yakima-Washington Memorial Hospital. There, Dr. Harrison says she should go to a partial hospitalization, so she was in that program for a month of intensive outpatient partial hospitalization after that. She was put on meds? Yes, she was first put on meds in 1991 for depression. That was kind of why I was given a little, and I guess I apologize to the court because you already have the history of the facts, but the importance of her previous injuries and her background was that she loved working at Safeway so much. In fact, in 1994, her treating doctor, Dr. Weinstein- I'm still waiting for an answer to my question. Isn't the heart of your claim that the ALJ erred because he didn't consider both her physical limitations and her mental limitations at the step four analysis when he was looking at her residual functional capacity? Yeah, that's the heart of our argument, Your Honor. That is. And Dr. Weinstein had said that she needed to be able to sit and stand, and he didn't incorporate that as far as the physical side. On the mental side, he didn't incorporate anything. My recollection of the record is that someone along the way, one of the doctors suggested that the only place she could work, if she could work, was at Safeway because she might feel some sort of a nurtured environment there, but of course she couldn't go back to work at Safeway. Yes. Dr. Robinson was the psychiatrist that saw her in March of 1998. Her alleged onset date is March of 1998, so this year period that Judge Dethloff was looking at was March 1998 to March 1999. And there are mental health records where on 20 different occasions during that period of time, Dr. Harrison saw her, her treating psychiatrist, and on all but two- I mean, most of them he noted she says she's doing fairly well. It's significant in this case to note that her MMPI from Dr. Vanderbilt, the one that the judge said he relied upon, said that she underreports her psychiatric symptoms, that that's the type of person she is. She underreports them. And she's a positive person. I mean, she received awards at Safeway. I think we understand that. I think we're still trying to figure out, you know, what the ALJ did wrong. Well, I think we have a focus on it. Yeah. She had this bipolar disorder that she had functional limitations from. That's included in step two because that's just a de minimis screening step. Right. Okay. Why don't you save the rest of your time for rebuttal and we'll go from there. Thank you, Your Honor. Thank you. Good morning. I'm Nancy Michelini for the commissioner. Good morning. Ms. Michelini, you may want to pull that mic down just a little bit. It's kind of up in my eyebrows, isn't it? That's right. This tree is a little bit taller than I am. To answer your question about bipolar II disorder, that's in the record at 243. That's okay. I just wanted to refresh my memory. I remember that. I think the issue is, as Judge Tallman has focused it, is step two is a fairly de minimis screening step. And there is some evidence of serious enough, arguably, to get past step two of a mental impairment as well as physical and having taken out and not looked at at step four. What's the response to that as to why that's appropriate? Yes, Your Honor. The ALJ found that her bipolar disorder was not severe for the requisite 12-month period. What happened here is she worked with this condition for 30 years. So Dr. VandenBelt said that this has been a condition that's lifelong, it's biologically based, genetically determined, and a lifelong mood disorder. However, in March of 1998, when she stopped working, she had an exacerbation of symptoms of bipolar disorder, which culminated in her hospitalization in July of 1998. Well, she also had an exacerbation of her physical disorder at the same time. Wasn't she having severe problems at that time? That's correct. My concern is it looks to me that the ALJ in this case almost treated this woman as a shirker. And I have looked at, I can't even begin to tell you how many of these records I've looked at in my almost 19 years as a judge. And I can assure you I've seen shirkers, and this woman isn't one. And she worked for many years. She wanted to continue to work. They switched her over to the video counter. She was working there, but because of her mental acuity problems, what had been an extremely competent person suddenly couldn't remember to lock up the video cassettes at the end of the day or to get customers to sign receipts. You know, this was a very sick woman. Well, Your Honor, and that was prior to her treatment with the lithium. She got on lithium. She was stabilized by that. She had a therapeutic dose of lithium by the end of August of 1998, and that's when she was a person. Well, the lithium didn't do a thing for her physical disability. Well, no, Your Honor, but it was the mental, I believe it was both the combination of the mental and the physical that exacerbated her problem. Well, but you can be disabled for Social Security purposes if you just have a physical disability and it's severe enough. One could, but she does not. Well, I don't know. It doesn't look good to me. Well, Your Honor, she participated in the pain clinic, and this is in 1997, February 1997 to May of 1997. She participated in the pain clinic and made remarkable progress at the pain clinic. Then she went back to work again, working just part-time, 20 hours a week, in the position that Your Honor indicated. There was a plan at that time to transition her back into full-time work, but then she injured herself again in February of 1998, and then stopped working altogether. Do you know how she injured herself? I believe she was opening a drawer. Yes, she just pulled out a drawer. And what does that tell you? It was above her head that she pulled out a drawer. Well, you know, my concern, I'm not suggesting that the ALJ may ultimately not be correct, but it just seems to me that when you dismiss somebody's claim at Step 2, you're saying, on the record, that this is a frivolous claim. Your Honor, the ALJ did not dismiss the claim at Step 2. It was at Step 4 he found that she was able to go back to her previous job. He ruled out mental at Step 2. Yes. He disconnected them. Right. The bipolar disorder did not meet the 12-month durational period. Because he discredited the opinions of other doctors. He discredited the opinion of her treating physician, Dr. Harrison, for a number of reasons. One, that they lacked objective findings, that they were inconsistent with Dr. VandenBelt's more detailed examination, which did have objective findings, and that also that he was functioning as an advocate. As I stated, Dr. VandenBelt opined that she, her bipolar disorder was something that was lifelong. She had been dealing with this. And it was only recently, in March, that she had an exacerbation. She, by the end of August of 1998, she was on a dose of lithium. Dr. Harrison released her from the partial psychiatric program, and at the time of her release she was assessed, a global assessment of functioning at 60, and he noted that in the previous year she had been at 70. Let me just go back. One of the things that bothered me with the Dr. Harrison, the ALJ said that Dr. Harrison's reports of comprehension and memory difficulties were discounted because Dr. VandenBelt hadn't documented such difficulties. But, you know, VandenBelt said that Burrow reported difficulty with concentration and memory. I cannot recall three items, three minutes after she was told to remember them. I believe that revealed poor concentration and memory. I mean, why isn't that documentation? Your Honor, I believe that the ALJ was rejecting the report that was signed, co-signed by Dr. Harrison. It was the report from Nancy Sprocker. I know, but he was saying Dr. VandenBelt hadn't documented any memory problems, and yet Dr. VandenBelt's own notes seem to suggest to the contrary. Well, Your Honor, Dr. VandenBelt, and also Mr. Tree argues that Dr. VandenBelt and Dr. Robinson's reports, the two different IMEs from March of 98 and from November of 98, are the same and that they're consistent. However, they're not the same. They are different. You have to read Dr. VandenBelt's whole report, his entire report. And throughout the report, he says that there is no reason why she can't go back to work. He says that there are no psychiatric contraindications. For her to return, and I'll go to at 260, he was answering a letter to Rainier Case Management, and is Ms. Burrow released to work as, and then there are a number of different positions, cashier, checker, office clerk, photo clerk, sales clerk, clerk general, receptionist. And he checked off yes to each one of those. This is Dr. VandenBelt. And next to that he has a notation that says no psychiatric contraindications. I don't know. It just seems very difficult to me. That somebody who can't open a drawer can suddenly go back to work at Safeway. I mean, you know, I'll be honest. I'm not speaking for my colleagues, but you certainly haven't convinced me that this woman isn't very sick. Well, Your Honor, she was very sick for a short period of time. She was very sick for a long period of time. And at the period of time that she couldn't open the drawer was prior to the treatment that she got with lithium. Once she was on the lithium, her condition improved. Council, lithium doesn't do a thing for her physical impairments. It may temporarily help her. There's something wrong with this mic. It may temporarily help her mental problems on a temporary basis, but it's nothing to do with her physical impairments. And it seems to me that the ALJ, in looking at this, didn't really carefully balance these things. It basically just said, well, she's taking lithium. She's okay. And therefore, she can go back to work. And in the meantime, you have these severe physical problems that haven't gotten much, if any, better. And it just, I have a real hard time with this case. I usually agree with the Social Security Administration, but I sure don't agree on this one, I don't think. Well, Your Honor, in my 20 remaining seconds, I would like to point out that the physical impairments, all the overwhelming evidence in the record, this is from the IME in March of 98, the IME in November of 98, Dr. Chaudhry, the treatment notes from Dr. Weber, all say that she can return to light work. So her physical impairments are not severe enough to prevent her from going back to light work. What's light work? Greeting people at the door?  Well, that's all right. You don't want the clock extended, I think. Thank you, Your Honor. I did want to say, because where we think the ALJ made some serious errors was, one, he found this lady to be not credible. And so that colored his whole decision, that she's not a credible person.  What I found difficult about that is that even, I think, their own doctor suggested she underreported her symptoms. So, I mean, I don't understand. That's why I say this does not appear to be a woman who is out there, as we often see, I'm sorry to say, trying to get a free ride for the rest of her life. Back in 94, she went to her doctor, and her doctor says, I'm taking you off work, you're disabled physically. And she said, no, please don't do it, doctor. And he let her go back to work part-time, and she worked herself back into it. But here's some important dates, I think, Your Honor, in the record from Dr. Harrison's notes. April 2299, more than a year after her alleged onset date. Her medication levels are right where they're supposed to be. So that's the argument of the commissioner. On her mental side, her medications are right, and so she's fine. But he follows it up, and he says, she continues to feel somewhat blue and undermotivated. We talked at length. Added another antidepressant. 6-2499, having mood swings. 8-699, has continued mood swings, irritability, and increased pain. 9-1099, has memory disturbance. Has symptoms including inattentiveness, very low energy level, chronic fatigue. 10-1899, she continues to struggle quite a lot with depression. That's well after the year period of time. Okay. I think we have the point. May I just say, Your Honor, on the motion to strike, that we haven't relied on any of that in our case today. I know. That we did. It was before the Appeals Council. We sent it to the Appeals Council. They didn't put two of our pages of reports that we gave to the Appeals Council. Didn't show up in the record. Does the government really object to that? Yes. Okay. Well, we'll take a look at it. That's fine. We know the argument. We've seen the arguments. Thank you. All right. The case argued is submitted, and we thank counsel for the argument.
judges: Fisher, Tallman, Ezra